1

2

3

4

5

6

7

8                **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   PHINEHAS LAMONT PARKER,                    CASE NO. CV-F-04-5783 OWW SMS HC

12                    Petitioner,               FINDINGS AND RECOMMENDATION___
                                                REGARDING PETITION FOR WRIT OF
13        vs.                                   HABEAS CORPUS

14   MIKE KNOWLES, Warden,                      [Doc. 1]

15                    Respondent.
     _____/
16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18   to 28 U.S.C. § 2254.

19                                 BACKGROUND

20          On December 23, 1997, the Stanislaus County District Attorney filed an information charging

21   Petitioner with attempted murder (Cal. Pen. Code §§ 664/187; count 1)[1], residential robbery (§

22   212.2; counts 2 and 3), assault with a deadly weapon (§ 245(a)(2); count 4), and burglary (§ 459;

23   count 5).  (CT 12-18.)  The information further alleged premeditation in count 1; personal use of a

24   firearm (§ 12022.5) in counts 1, 2, 3, and 5; great bodily injury (§ 12022.7) in counts 1 and 2; a

25   firearm enhancement (§ 12022.5) in count 4; and service of a prior prison term (§ 667.5(b)) in counts

26   1 through 3.  (Id.)

27   _____

28          [1] All further statutory references are to the California Penal Code unless otherwise indicated.

                                                    1

1     Petitioner pled not guilty.  (CT 19.)

2         Two mistrials occurred in this case.  The trial court declared the first mistrial on August 20,

3     1998, because Petitioner threatened his attorney.  (CT 152.)  The second mistrial was declared on

4     December 15, 1998, because defense counsel became ill.  (CT 301.)

5         The third trial commenced on April 19, 1999.  (CT 307.)

6         On April 26, 1999, the jury convicted Petitioner on all counts and found the special

7     allegations to be true.  (CT 388-395.)  In a bifurcated proceeding, the court found true the prior

8     prison term allegations.  (CT 324.)

9         On June 18, 1999, the court sentenced Petitioner to 35 years and 8 months in prison.  (CT

10    427-428.)

11        Petitioner filed the instant petition for writ of habeas corpus on May 24, 2004.  Respondent

12    filed an answer addressing the merits of the petition on October 26, 2005, and Petitioner filed a

13    traverse on January 17, 2006.  (Court Docs. 32, 36.)

14                              STATEMENT OF FACTS

15        On March 8, 1997, Manuel Ruelas and his common-law wife, Chela Miller, were asleep with

16    their six children in the home, the newborn infant asleep with them in their master bedroom.  That

17    night Ruelas had taken home $9,000 in cash and left it in his pant pockets which were on the floor in

18    the bedroom.  (RT 186-187.)  Between 3:00 and 3:30 a.m. that morning, the two were awakened in

19    their bedroom by two masked men.  (RT 178-179, 416.)  One man was identified as being African-

20    American and the other Asian.  (RT 180, 419, 421.)  The African-American intruder wore rugged,

21    black work boots.  **(RT 190.)**  The men pointed guns at Mr. Ruelas and threatened to kill him if he

22    did not tell him where he kept his money and his gun.  (RT 179, 187, 218-219, 418.)  Mr. Ruelas

23    denied having any money, and the men riffled through the house looking for the cash.  **(RT 180-181,**

24    187, 209-210, 419, 422**.)**  The Asian intruder grabbed Ruelas's watch and a gold chain with an

25    attached crucifix, which was set with diamonds and rubies, from the top of a dresser.  (RT 181, 187,

26    209-210, 419, 422**.)**  Ruelas's silver belt buckle and gold watch were also taken.  (RT 219-220.)

27    After unsuccessfully attempting to locate the cash, the Asian intruder pointed the gun at Ms. Miller's

28    vagina and the baby's head threatening to kill them if Ruelas did not tell them where the money was

1  located.  (RT 183, 419-420.)

2      The African-American intruder located a safe that Ruelas had recently purchased and

3  instructed him to open it; however, Ruelas indicated that he did not know the combination.  (RT 187-

4  188.) The intruder then warned Ruelas that if he found the money he would kill him.  (RT 422-423.)

5      The African-American intruder eventually located the money and then gave Ruelas a "weird

6  look" and shot him in the face from approximately five to six feet away, as Ruelas was sitting on the

7  bedroom floor.  (RT 189.)  The bullet passed through his cheekbone, broke his collarbone, and

8  lodged in his left armpit.  (RT 194-195.)  While Ruelas was still conscious, the African-American

9  intruder approached him and aimed the gun at his forehead, Ruelas pleaded with him to "just go."

10  (RT 190-191, 424.)  He then walked away.  (RT 192.)

11      During this time, Ms. Miller was hiding behind the bedroom recliner, and believed that the

12  intruders had left after they shot at Ruelas.  (RT 423.)  She eventually escaped through the bedroom

13  window and ran to a neighbor's house, and both she and Ruelas called 911.  (RT 423.)  The intruders

14  too fled the scene.  (RT 424.)  Officers of the Modesto Police Department arrived at the residence.

15  (RT 234-235, 433-434.)  Mr. Ruelas was taken to the hospital and interviewed by police, while Ms.

16  Miller remained at the residence and was interviewed there.  (RT 234-237, 434-435.)  Ruelas

17  described the African-America intruder as 5 feet 10 inches tall, 180 pounds and approximately 25 to

18  30 years old.  (RT 237.)  At trial, Ruelas described him as being 6 feet 2 inches tall.  (RT 190.)

19  Miller estimated that the African-American intruder was approximately 6 feet 2 inches or 6 feet 4

20  inches tall and in his 20's.  Petitioner is African-American and was 25 years old at the time the

21  offense occurred.  The parties stipulated that he is shorter than 6 feet 1 inches tall.  (RT 554.)

22      On March 12, 1997, Clarissa Hurtado, Petitioner's girlfriend, sold a gold chain at a local

23  pawnshop, which was discovered by police.  (RT 242-246.)  The chain was identified as the one

24  taken from Ruelas's and Miller's residence.  Subsequently on March 14, 1997, Clarissa Hurtado sold

25  the crucifix to a different pawnshop.  (RT 244-245.)

26      Police executed a search warrant at Hurtado's residence on March 21, 1997.  (RT 247-248.)

27  Police located a pair of black work boots, similar to the boots described by the victims, several

28  pieces of men's clothing, including three black T-shirts, and two letters addressed to Petitioner.  (RT

3

248-249, 251, 488.)  The boots were sent to the Department of Justice laboratory for DNA testing, blood splattered on the boots matched DNA which was consistent with Mr. Ruela's DNA.  (RT 358-359.)  Ruelas identified the boots recovered from Hurtado's residence as matching the boots worn by the man who shot him.  (RT 217.)  He also identified the pawned gold chain as his.  (RT 216.) Although the crucifix had been melted down by the pawnshop, Ruelas identified a picture of a similar one that had been taken.  (RT 245.)

On or about May 11, 1997, Ruelas and two other men were arrested for attempting to purchase pseudoephedrine (an ingredient used in the production of methamphetamine).  The State filed charges against Ruelas, which were subsequently dismissed.

Two mistrials occurred in this case.  On August 16, 1998, the day before the first trial, a deputy sheriff tape recorded a jailhouse visit between Petitioner and Hurtado.  A relevant portion of the tape was placed for the jury, in which Petitioner directed that Hurtado fabricate a story about how she had acquired the chain and crucifix that was subsequently pawned.  Hurtado told Petitioner that she would tell police that she purchased the chain at a flea market a few years ago, and that she would describe the stones on the crucifix as being orange and not rubies.  During the conversation, Hurtado was observed holding up pieces of paper to the glass separator.

On October 20, 1998, investigators from the district attorney's office stopped Hurtado outside the jail after a visit with Petitioner.  She struggled with the men and tore up the piece of paper she was holding and stuffed it into her mouth.

Hurtado did not appear at Petitioner's trial and was declared unavailable by the trial court. Accordingly, the prosecution introduced her testimony from the second trial.  There, she testified that an individual named Manuel asked her to pawn a crucifix containing orange stones.  (RT 459-470, 476.)  Consistent with her conversation with Petitioner at the jail, she testified that she had purchased the chain from a flea market and decided to pawn it because she did not wear jewelry very often. (RT 477-478.)  She testified that although Petitioner did not live with her, he stayed with her occasionally in March 1997, and she was pregnant with his child at the time.  (RT 488.)  However, other men stayed at the residence also.  (RT 523.)  The prosecution introduced the tape recording of the conversation between Petitioner and Hurtado on August 16, 1998, and also introduced the torn

1  note, to support the claim that Hurtado perjured herself at Petitioner's request.  (CT 225-248; RT

2  499-523.)

3      Defense

4      Petitioner's defense at trial was mistaken identity.  Petitioner did not testify.  He presented

5  one witness, Denise Haynes, his mother.  She testified that Petitioner lived with her in March of

6  1997 and she loaned him $500 for bail for his girlfriend.  (RT 552-553.)  From this, the defense

7  argued that if Petitioner had $9,000 in stolen cash, he would not have needed to borrow money.

8      The defense challenged the prosecution's case arguing that there was insufficient evidence

9  demonstrating that the boots belonged to Petitioner as Ms. Hurtado had other lovers who stayed with

10  her.  (RT 523.)  The defense challenged the DNA evidence claiming it was unreliable for several

11  reasons.  (*See* RT 288–291, 370-371, 374, 386-387, 409-410, 618.)  It was further argued that a

12  bloody shoeprint on a piece of paper found in the victim's bedroom did not match the print of

13  Petitioner's boots and there was no attempt to find a further match, which therefore could have

14  belonged to the shooter.  (RT 282, 288, 314, 607.)

15      Mr. Ruelas was impeached with the prior-drug related arrest.  (RT 223.)  Ruelas's business

16  receipts did not support his claim that the $9,000 in stolen cash was from his business.  (RT 226.)

17  The defense argued that Ruelas was a drug dealer and had connections with irreputable individuals

18  who may have robbed and assaulted him.  (RT 608.)  The defense argued that the suspects wore

19  masks because they likely knew the victim and did not want to be identified.  (RT 608.)

20                                    DISCUSSION

21  A.    Jurisdiction

22      Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

23  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

24  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

25  375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

26  guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Stanislaus County

27  Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

28      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

2   Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499

3   (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97

4   F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

5   *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

6   to cases filed after statute's enactment).   The instant petition was filed after the enactment of the

7   AEDPA and is therefore governed by its provisions.

8   B.      Standard of Review

9           This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

10  pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

11  Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

12          The AEDPA altered the standard of review that a federal habeas court must apply with

13  respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

14  Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

15  not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

16  involved an unreasonable application of, clearly established Federal law, as determined by the

17  Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

18  determination of the facts in light of the evidence presented in the State Court proceeding." 28

19  U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

20  approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

21  1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

22  concludes in its independent judgment that the relevant state-court decision applied clearly

23  established federal law erroneously or incorrectly."   Lockyer, at 1175 (citations omitted).  "Rather,

24  that application must be objectively unreasonable."  Id. (citations omitted).

25          While habeas corpus relief is an important instrument to assure that individuals are

26  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

27  Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

28  conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

1   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

2   determinations must be presumed correct, and the federal court must accept all factual findings made

3   by the state court unless the petitioner can rebut "the presumption of correctness by clear and

4   convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

5   (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

6   1388 (9th Cir. 1997).

7   C.      Procedural Default

8           Respondent argues that Grounds 2(C) and (D) and Ground 4, are procedurally defaulted.[2]

9           Federal courts "will not review a question of federal law decided by a state court if the

10   decision of that court rests on a state law ground that is independent of the federal question and

11   adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546

12   (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  If the court finds an independent

13   and adequate state procedural ground, "federal habeas review is barred unless the prisoner can

14   demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to

15   consider the claims will result in a fundamental miscarriage of justice."  Noltie v. Peterson, 9 F.3d

16   802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150

17   (9th Cir. 2000).

18           "For a state procedural rule to be 'independent,' the state law basis for the decision must

19   not be interwoven with federal law."  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (citing

20   Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d

21   1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears

22   to rest primarily on federal law, or to be interwoven with federal law.'"  (quoting Coleman, 501 U.S.

23   at 735, 111 S.Ct. 2456)).  "A state law is so interwoven if 'the state has made application of the

24   procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether

25   _____

26           [2]  Respondent notes that the California Supreme Court imposed the procedural ruling with respect to Grounds 2,
27   3, 4, and 5, however, Respondent's assertion of the procedural default defense is limited to Grounds 2(C) and (D) and Ground
     4 only.  This is so because under current circuit authority when imposing the procedural rules the California Supreme Court
     did not expressly state which rules applied to which grounds for relief.  Koerner v. Grigas, 328 F.3d 1039, 1052-53 (9th Cir.
28   2003) (quoting Valerio v. Crawford, 306 F.3d 742, 774-775 (9th Cir. 2002) (en banc)).

1   federal constitutional error has been committed.'"  Park, 202 F.3d at 1152 (*quoting* Ake v.

2   Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

3       To be deemed adequate, the state law ground for decision must be well-established and

4   consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule

5   constitutes an adequate bar to federal court review if it was 'firmly established and regularly

6   followed' at the time it was applied by the state court.")(*quoting* Ford v. Georgia, 498 U.S. 411, 424,

7   111 S.Ct. 850 (1991)).  Although a state court's exercise of judicial discretion will not necessarily

8   render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards

9   that, at least over time, can become known and understood within reasonable operating limits.'"  Id.

10  at 377 (*quoting* Morales, 85 F.3d at 1392).

11      With respect to Grounds 2(C) and (D), in his second and third habeas petitions filed in the

12  California Supreme Court the only claim asserting a Fourth Amendment violation was Ground 2.

13  There, in subclaims "C" and "D," Petitioner challenged the constitutionality of a warrantless search

14  of his jail cell and of the warrantless monitoring of his jailhouse conversations with his wife.  The

15  California Supreme Court cited In re Lessard, 62 Cal.2d 497, 503 (1965), which states that a

16  defendant may not collaterally attack a final judgment in a state petition for writ of habeas corpus on

17  the ground that the trial court admitted evidence which was allegedly secured in violation of the

18  Fourth Amendment.  For the reasons advanced by Respondent, the Lessard bar is both independent

19  and adequate.  In Stone v. Powell, 428 U.S. 425, 494 (1975), the United States Supreme Court

20  reached the same decision as applicable to federal habeas corpus petitions.  Nevertheless, the state

21  rule announced in Lessard, eleven years prior to Stone, is independent of federal law.

22      It is also adequate as it is regularly and evenly applied by the state courts.  See In re Harris, 5

23  Cal.4th 813, 830 (1993) (noting this long-standing rule as an example of an issue which prisoners are

24  "certainly" precluded from relitigating in state collateral proceedings); In re Clark, 5 Cal.4th 750,

25  767 (1993) (citing Lessard and older authority for the proposition that constitutional search and

26  seizure claims are not cognizable on habeas corpus in California because of the long-standing rule

27  that error in admitting evidence allegedly obtained in violation of Fourth Amendment protections

28  does not create a risk of convicting an innocent person); Gingrich v. Oberhauser, 305 F.Supp. 738,

8

740 (C.D. Cal. 1969) (finding federal claims procedurally defaulted based in part on state imposition of <u>Lessard</u> bar).

The Court agrees with Respondent that although the state procedural rule (<u>In re Lessard</u>) parallels that of the federal rule (<u>Stone v. Powell</u>), no less preclusive effect should be given. *Cf.* <u>Francis v. Henderson</u>, 425 U.S. 536, 537-542 (1976) (concluding that where a state habeas petitioner was precluded from attacking racial composition of grand jury in state habeas proceedings because of failure to timely object to grand jury composition before trial, the federal court must respect such state timeliness requirement, which parallels requirement imposed for federal criminal defendants, and refuse to hear merits of claim). Thus, the <u>Lessard</u> procedural bar precludes this Court's review of Grounds 2(C) and (D).

With respect to Ground 4, Petitioner alleges that there was insufficient evidence of attempted murder. This claim was presented to the California Supreme Court on two occasions – in Petitioner's first and third habeas petitions to that court. (Court Doc. 15; Resp's Mot. to Dismiss, Exhibit G at "exhibit B"; Exhibit I at "exhibit A.") The California Supreme Court denied Ground 4 with a citation to <u>In re Lindley</u>, 29 Cal.2d 709 (1947). As Respondent submits, there were no other insufficiency of the evidence claims and thus the <u>Lindley</u> bar was unambiguously applied to Ground 4.

<u>Lindley</u> is both an independent and adequate state ground to prevent federal collateral review. A citation to <u>Lindley</u> stands for the proposition that insufficiency of the evidence claims will not reviewed in a state habeas corpus petition. In <u>Carter v. Giurbino</u>, 385 F.3d 1194 (9th Cir. 2005), the Ninth Circuit concluded that the <u>Lindley</u> rule, "is not intertwined with federal substantive or procedural law." <u>Id</u>. at 1197. When applying the <u>Lindley</u> rule, the state courts do not apply federal law, therefore, it is an independent state ground. <u>Id</u>. at 1197-1198. In <u>Carter</u>, the Ninth Circuit determined that "the California courts have consistently applied *Lindley* since 1947." <u>Id</u>. at 1198 (citing <u>In re Adams</u>, 14 Cal.3d 629, 636 (1975); <u>People v. Beghtel</u>, 164 Cal.App.2d 294 (1958); <u>In re Ring</u>, 64 Cal.2d 450, 452 (1966).) As Respondent submits, the California Supreme Court imposed the <u>Lindley</u> bar as to both of the state habeas petitions that raised the instant insufficiency of the evidence claim, further supporting the finding that <u>Lindley</u> is consistently applied by the California

9

1   Supreme Court.  Accordingly, Respondent has properly plead the existence of the affirmative

2   defense of the procedural bar.

3       Under <u>Bennett v. Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2003), once the state has properly

4   raised the affirmative defense of procedural default, the petitioner must place the state's affirmative

5   defense of independent and adequate state procedural grounds at issue "by asserting specific factual

6   allegations that demonstrate the inadequacy of the state procedure."  <u>Id</u>.

7       Here, Petitioner merely contends that a miscarriage of justice has resulted due to the trial

8   court's errors.  Petitioner has failed to meet his burden under <u>Bennett</u> by asserting specific factual

9   allegations to demonstrate the inadequacy of the state procedure.  As such, the claims are

10  procedurally defaulted.  In any event, even if these claims were not procedurally defaulted, for the

11  reasons explained below, they fail on the merits.

12  D.    <u>Trial Court's Denial of Motion to Dismiss</u>

13      Petitioner contends that the trial court violated his rights to counsel, due process, and a fair

14  trial when it remedied governmental interference with his attorney-client relationship by excluding

15  evidence rather than dismissing the charges against him.

16      As set forth by Respondent, the California Court of Appeal recounted the pertinent facts as

17  follows:

18          On October 21, 1998, a warrantless search of Petitioner's jail cell was
        executed by Bill Andrews, an investigator from the office of the district attorney, for
19      the purpose of obtaining evidence of a conspiracy between Petitioner and Hurtado to
        commit perjury. [CT 218-219; RT 11/12/98 14, 21, 103.] Among other writings, a
20      writing pad containing handwritten notes was seized.  [CT 221; RT 11/12/98 51-53,
        56-57, 104.] Petitioner subsequently moved for dismissal of the charges, arguing that
21      the search was illegal and the notes were confidential papers he had prepared for his
        attorney. [CT 170-193.]
22          In a declaration filed in opposition to the dismissal motion and at the hearing
        thereon, Andrews averred that he was handed the writing pad by a deputy. [RT
23      11/12/98 51.] The first few pages of the pad contained rap lyrics, followed by the
        pages containing the notes. [RT 11/12/98 53, 105; CT 216.] He scanned the notes and
24      determined they might be relevant. [RT 11/12/98 52, 58.] He did not see anything that
        indicated this was legal material or was intended for an attorney. [RT 11/12/98 60.]
25      He made a photocopy of the notes, along with some letters between Petitioner and
        Hurtado.  The photocopy was placed on the prosecutor's desk. [RT 11/12/98 64.] He
26      did not talk to the prosecutor about the notes. [RT 11/12/98 64.]
            The prosecutor testified that after looking at the first page of the notes, he
27      sealed them in an envelope and then spoke with another individual in the office to ask
        his opinion about how to proceed because he did not "want to take the chance that it
28      might be privileged material." [CT 223; RT 11/12/98 80-81, 83.] He did not show the

notes to anyone else. [RT 11/12/98 81.] He did not read the first page of the notes thoroughly and he only flipped through the subsequent pages. [RT 11/12/98 80, 83.] Petitioner's attorney called the following day to discuss the seizure of the notes.

Petitioner testified that the notes had been kept in an envelope marked "Discovery Motion, Kelly/Frye Hearing" and "Jury Trial." [RT 11/12/98 110-101, 108; RT 11/13/98 125.]

The court found the warrantless search of the cell and seizure of the notes to have been improper and suppressed all the evidence derived from the search. [CT 263; RT 11/13/98 142, 150.] However, it concluded that dismissal of the case was too drastic a remedy and denied the motion. [CT 263; RT 11/13/98 142, 147.]

On December 3, 1998, we summarily denied Petitioner's petition for issuance of a writ of mandate.

(Court Doc 15, Resp's Mot. to Dismiss, Exhibit C at 23-24 (references to "defendant" converted to "Petitioner"; citations to the record inserted.)

The Sixth Amendment protects the right of a defendant to have the assistance of counsel. The right to counsel is implicated if there is interference by the government with the confidential relationship between defendant and attorney.  United States v. Morrison, 449 U.S. 361, 364 (1981); Weatherford v. Bursey, 429 U.S. 545, 554-558 (1977); Clutchette v. Rushen, 770 F.2d 1469, 1471 (9th Cir. 1985).  Even if there is interference, the Sixth Amendment is only violated if the interference substantially prejudices the defendant.  United States v. Danielson, 325 F.3d 1054, 1069 (9th Cir. 2003) (analyzing Weatherford v. Bursey, 429 U.S. 545 (1977) and citing United States v. Irwin, 612 F.2d 1182, 1186-87 (9th Cir. 1980).); see also Williams v. Woodford, 384 F.3d 567, 584-585 (9th Cir. 2004) ("When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant.") There may be substantial prejudice to the defendant if the introduction of evidence, gained through the intrusion, is admitted against the defendant at trial, the prosecution's use of the confidential information, or if the prosecution the information to gain an unfair advantage at trial.  Danielson, 325 F.3d at 1069-70.

Petitioner raised the instant claim in his direct appeal to the California Court of Appeal and California Supreme Court.  This Court looks to the last reasoned state court decision, issued by the Court of Appeal. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie

v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).  In denying Petitioner's claim that dismissal of the charges would have been too drastic a remedy, the Court of Appeal reasoned as follows:

> Neither party contests the trial court's determinations that the warrantless search was illegal and that the notes were privileged legal communication[3]  Accordingly, we will assume for purposes of this discussion only that the trial court's order was correct in both of these respects and focus exclusively on the adequacy of the remedy.  Dismissal of the charges is an inappropriate remedy for a pretrial violation of a defendant's constitutional rights absent demonstrable prejudice or substantial threat thereof.  (*United States v. Morrison* (1981) 449 U.S. 361, 365-367, 101 S.Ct. 665, 66 L.Ed.2d 564; *People v. Lowery* (1988) 200 Cal.App.3d 1207, 1228-1229, 246 Cal.Rptr. 443.)  Defendant contends that such prejudice "is manifest."  Even though the prosecutor did not read the material, investigator Andrews would have conveyed the contents of defendant's writing to him "without the prosecutor being aware of the source of this advice."  Since the court did not read the material itself, it could not assess the damage this would do to his defense.  We reject this position as being speculative and contrary to the evidence.  Andrews testified that he did not discuss the notes with the prosecutor.  Furthermore, he had quickly scanned this material, perusing it only to the degree necessary to determine that it might fall within the perimeters of the prosecutor's instructions that he was to search for evidence of a conspiracy to commit perjury.  Andrew's testimony was confirmed by custodial Deputy Raymond James Framstad who was present during the search.  Since Andrews had only quickly scanned the notes, he could not have conveyed their contents to the prosecutor with the specificity necessary to generate a tangible strategic or evidentiary benefit to the People.
>
> We agree with the trial court that dismissal was too drastic a remedy.  The prosecution carried its burden of proof by establishing an absence of prejudice to the defendant.  The prosecutor affirmatively showed that the People had not obtained any benefit from the seizure of the notes.  The notes were not exploited in any way and no evidence was subsequently discovered because of the presumptively illegal search and seizure.  Furthermore, defendant has not shown that his defense was impaired in any manner that could not be remedied by exclusion of the notes.  Under the circumstances presented here, dismissal of the charges was not warranted.  (*United States v. Morrison*, *supra*, 449 U.S. at pp. 365-367; *People v. Lowery*, *supra*, 200 Cal.App.3d at pp. 1228-1229, 246 Cal.Rptr. 443.)

---

[3] Respondent submits that the People did dispute the legality of the warrantless jail-cell search.  Specifically, at trial, the People argued that Petitioner had no reasonable expectation of privacy in jail and that the search was justified by evidence that suggested Petitioner and his wife, Clarissa Hurtado, who was out of custody, were attempting to influence witnesses and/or jurors.  (CT 204-209; accord RT 34, 72-75.)  On appeal, the People incorporated these arguments into the Respondent's Brief both by reference and through express reiteration.  (Lodged Doc. No. 1 at 46.)  The People's appellate brief additionally noted the precautions taken "not to search any writings marked 'legal mail.'"  (Id.; accord RT 23, 25, 30-32, 65, 76.)  The People prefaced their discussion of the appropriate remedy with the words "[e]ven assuming arguendo the search was unconstitutionally intrusive," id., and thus the People have never forfeited the argument that the search of Petitioner's cell was lawful.  (See Resp's Answer ¶ 19.)  Respondent addresses the Fourth Amendment issue separately in its answer, and Respondent's request to incorporate the argument is granted.

12

1   (Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C at 24-25.)

2        The California Court of Appeal's factual findings are not unreasonable in light of the

3   evidence, and Petitioner has failed to demonstrate otherwise.  The Court specifically found that

4   investigator Bill Andrews "only quickly scanned the notes" and "could not have conveyed their

5   contends to the prosecutor with the specificity necessary to generate a tangible strategic or

6   evidentiary benefit to the People." (Id. at 25.)  Further, the state court found "[t]he prosecutor

7   affirmatively showed that the People had not obtained any benefit from the seizure of the notes.  The

8   notes were not exploited in any way and no evidence was subsequently discovered because of the

9   presumptively illegal search and seizure." (Id.)  The factual findings support the conclusion that the

10  intrusion need only be remedied by exclusion of the evidence from the trial and not the more drastic

11  dismissal of the charges.  There being no prejudice to Petitioner, the state courts' conclusion that

12  dismissal was inappropriate is not contrary to Supreme Court authority.  In Morrison, the Supreme

13  Court specifically held that, absent a showing of prejudice, "[t]he remedy in the criminal proceeding

14  is limited to denying the prosecution the fruits of its transgression." 449 U.S. at 366.  That is

15  precisely what the state court did in this case.

16       In his traverse, Petitioner contends that the trial court's ruling was based on extrinsic

17  evidence of the relationship between the trial judge and the district attorney.  Petitioner's claim is

18  unfounded.  Rather, as found by the state court of appeal, the record amply supports the finding that

19  although the search was illegal, the evidence need only be excluded from the trial, and dismissal of

20  the charges was not warranted.

21       As submitted by Respondent, a similar out-of-circuit case, United States v. Sander, 615 F.2d

22  215 (5th Cir. 1980 (per curiam), provides additional support for the reasonableness of the state court's

23  adjudication.[4] There, police examined the attorney's confidential file in the defendant's case

24  following the attorney's murder.  Sander, 615 F.2d at 219.  The trial court denied the motion to

25  dismiss because there was no showing of injury of prejudice as a result of the viewing of the file.  Id.

26  Nothing that was in the attorney file was utilized in the prosecution of the case.  Id.  Where such is

27

28       [4] See LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (recognizing out-of-circuit federal and state appellate court
    decisions are helpful in determining the reasonableness of a state court adjudication in light of Supreme Court authority.)

1  the case, the appropriate remedy is exclusion of the evidence rather than dismissal of the case.  Id.

2  Likewise, here, "[t]he notes were not exploited in any way and no evidence was subsequently

3  discovered because of the presumptively illegal search and seizure."  The prosecution gained no

4  advantage and did not use the notes in the prosecution of its case.  Accordingly, the state courts'

5  denial of Petitioner's claim was not contrary to or an unreasonable application of clearly established

6  Supreme Court authority.

7  E.      Prosecutorial Misconduct

8           Petitioner contends that the prosecutor committed misconduct based on (1) his comment

9  during opening statement that Petitioner admitted to owning boots linked to the crime when such

10  admission was later suppressed; (2) elicitation of testimony from victim Ruelas regarding the boots

11  that was tainted by a suggestive identification; (3) authorization of a jail-cell search; and (4)

12  recording of Petitioner's jail-house conversation with his wife.

13           1.      Opening Statement

14           Petitioner contends that the prosecutor committed misconduct during his opening statement

15  when he stated that Petitioner admitted to owning boots that were linked to the crime because this

16  statement was later suppressed.  Petitioner raised this claim on direct appeal, which was adjudicated

17  on the merits by the California Court of Appeal.  (Resp's Mot. to Dismiss, Exhibit C, at 19-21.)  The

18  claim was also raised in the second and third state habeas petitions to the California Supreme Court

19  (Court Doc. 15, Resp's Mot. to Dismiss; Exhibit H, arg. 1a; Exhibit I at "C") and rejected for

20  procedural reasons (Court Doc. No. 20, attach no. 1.)

21           The California Court of Appeal summarized the relevant facts as follows:

22                   The prosecutor's opening statement included the following remark: "So [the
         investigating detective] at some point later talks to the defendant, asks him what he
23       knows about these boots, and he can't tell [him] anything about it.  He says, 'I haven't
         loaned them out or anything like that although I may have gotten into a fight with
24       some Hispanic guy at some point.'"
                 On the fourth day of trial defense counsel moved to suppress the contents of
25       this interview because defendant had not been given the advisements required by
         Miranda. . . . Hearing was held, after which the motion was granted.
26
    (Resp's Mot. to Dismiss, Exhibit C at 19 (quoting from RT 170).)
27
             In rejecting Petitioner's claim, the Court of Appeal held:
28

14

1
2
3
4
5
6
7
8
9

     We also reject the claim on the merits. "[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor was so patently inadmissible as to charge the prosecutor with knowledge that it would never be admitted." (*People v. Davenport* (1995) 11 Cal.4th 1171, 1212-1213 . . .; *People v. Martinez* (1989) 207 Cal.App.3d 1204, 1225, fn. 5 . . . .) The challenged utterance does not rise to this standard. The trial court characterized the determination whether this evidence should be excluded as a "close" question. We agree. Therefore, even if the prosecutor knew the admissibility of defendant's statement to the investigating office would be challenged, defendant has not shown that the evidence was so patently objectionable as to charge the prosecutor with knowledge that it could not be admitted.

     Defendant's reliance on authorities explaining that the reviewing court's focus should be on the effect of the misconduct rather than the blameworthiness of the prosecutor is misplaced because his position assumes that the challenged utterance was, in fact, misconduct. As explained above, when evaluated under the standard established in *People v. Davenport*, *supra*, 11 Cal.4th 1171 . . ., the challenged utterance is not chargeable as misconduct.

10   (Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C at 20-21.)

11       A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so

12   infected the trial with unfairness as to make the resulting conviction a denial of due process."

13   Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v.

14   DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); *see* Bonin v. Calderon, 59 F.3d 815,

15   843 (9ᵗʰ Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of

16   sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller,

17   485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* United States v. Bagley, 473 U.S. 667, 105

18   S.Ct. 3375 (1985)). Under this standard, a petitioner must show that there is a reasonable probability

19   that the error complained of affected the outcome of the trial - i.e., that absent the alleged

20   impropriety, the verdict probably would have been different. Comments made during an opening or

21   closing statement may be so prejudicial to support a finding of constitutional error. Frazier v. Cupp,

22   394 U.S. 731, 736 (1969). However, there is no error if the prosecutor gives an "objective summary

23   of evidence which the prosecutor reasonably expects to produce," even if events at trial prevent the

24   prosecutor from actually presenting that evidence. Id. Further, "the court should not reverse a

25   defendant's conviction if substantial, independent and credible evidence of the defendant's guilt

26   overwhelms whatever incriminating aspects inadmissible statements may have had in isolation." Id.

27   (internal quotations omitted).

28       Here, defense counsel did not file a motion to suppress the statement made by Petitioner prior

1   to trial.  Thus, at the time the prosecutor presented his opening statement, it is reasonable to assume

2   that he believed it would be introduced at trial.  Even if it was ill-advised for the prosecutor to

3   provide such a detailed opening statement, as Respondent submits, this is not a rare case in which the

4   prosecutor referred to patently inadmissible evidence in an effort to taint the jury.  (*See* RT 541

5   (although the trial court ultimately suppressed the admission, it stated "It's a fine line here.  It's a

6   close case.").)  There is simply no showing that the prosecutor intentionally intended to taint the jury.

7   Additionally, and of significant importance, the jury was specifically instructed that the prosecutor's

8   opening statement was not evidence and it is presumed the jury followed this instruction.[5]  <u>Francis v.</u>

9   <u>Franklin</u>, 471 U.S. 307, 324 n.9 (1985) (the Supreme Court "presumes that jurors, conscious of the

10  gravity of their task, attend closely [to] the particular language of the trial court's instructions in a

11  criminal case and strive to understand, make sense of, and follow the instructions given them."

12  Petitioner has failed to demonstrate otherwise.

13          As provided by Respondent in his answer, two out-of-circuit opinions provide further support

14  that the trial court's admonishment in the instructions safeguarded against any potential error.  In

15  <u>United States Chirinos</u>, 112 F.3d 1089, 1098-1099 (11th Cir. 1997), the court of appeals found that

16  there was no prosecutorial misconduct when, as here, the prosecutor referred to evidence during

17  opening statement that was later excluded by the trial court because the prosecutor had reason to

18  believe the evidence was admissible, the prosecutor did not refer to the evidence once it was

19  excluded, and the jury was specifically instructed that the prosecutor's statements during opening

20  argument were not evidence, and defense counsel challenged the prosecutor's statement.  Likewise,

21  in <u>United States v. Tolman</u>, 826 F.2d 971, 973-974 (10th Cir. 1987), the court of appeals found no

22  prejudice from the prosecutor's reference, during opening statement, to the presence of the

23  defendant's fingerprints in a drug laboratory which was excluded from the trial because the jury was

24  instructed that opening statements were not to be considered as evidence and during closing

25  statement the prosecutor told the jury that it should not consider evidence which was not introduced

26  at trial.  These cases further illustrate and support this Court's finding that the state court's decision

27

28      [5]  The trial court told the jury that "[s]tatements made by the attorneys during the trial are not evidence," and "[a]n opening statement is not evidence.  Shouldn't be considered by you as evidence."  (RT [4/19/99] 159, 165.)

16

1    was not contrary to, or an unreasonable application of, clearly established Supreme Court authority.

2           2.    Suborn Perjury

3           Petitioner contends that the prosecutor suborned perjury from victim Ruelas by eliciting

4    testimony about the boots that was tainted by a suggestive identification.  This claim was raised in

5    Petitioner's second and third petitions to the California Supreme Court (Court Doc. 15, Resp's Mot.

6    to Dismiss, Exhibit H at arg. 1b; Exhibit I at "C") and was rejected for procedural reasons.  (Court

7    Doc. 20, attach no. 1.)  Accordingly, review of this claim is de novo because there is no state court

8    adjudication on the merits.  See Killian v. Poole, 282 F.3d 1202, 1208 (9th Cir. 2002) (de novo rather

9    than deferential review is appropriate where the state court has not adjudicated a claim on the

10   merits).

11          "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair,

12   and must be set aside if there is any reasonable likelihood that the false testimony could have

13   affected the judgment of the jury."  United States v. Bagley, 473 U.S. at 678 (quoting United States

14   v. Agurs, 427 U.S. 97, 103 (1976).  Likewise, the prosecution has a constitutional duty, even if not

15   soliciting false evidence, to correct any false impression of the facts.  Napue v. Illinois, 360 U.S. 264,

16   269 (1959); United States v. LaPage, 231 F.3d 488, 492 (9th Cir. 2000).  However, the prosecutor is

17   not held accountable for discrepancies in testimony if there is no evidence to support a finding of

18   prosecutorial misconduct.  See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995);

19   United States v. Wolf, 813 F.2d 970, 976-977 (9th Cir. 1987) (discrepancies in witness testimony,

20   subject to cross-examination, did not constitute grounds for reversal).  There must be a factual basis

21   to support the finding that perjured testimony was knowingly presented by the government.  See

22   Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004).

23          Accordingly, to establish a claim of prosecutorial misconduct, petitioner must demonstrate

24   that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have

25   known the testimony was actually false; and (3) that the false testimony was material."  United States

26   v. Zuno-Acre, 339 f.3d 886, 889 (9th Cir. 2003) (citing Napue, 360 U.S. at 269-271).

27          When the prosecutorial misconduct claim involves a violation of the prosecutor's duty not to

28   present, or to correct, false evidence, the general standard of error as established in Brecht v.

17

1   Abrahamson, 507 U.S. 619, 637 (1993) that the error had a substantial and injurious effect or

2   influence in determining the jury's verdict, does not apply.  Hayes v. Brown, 399 F.3d 972, 984 (9th

3   Cir. 2005).  Rather, the standard as set forth in Agurs, is whether there is "any reasonable likelihood"

4   that the false evidence could have affected the jury's judgment.  Id. at 984.

5         Petitioner's claim fails on the merits for several reasons.  First, Petitioner has failed to

6   demonstrate that Ruelas committed perjury.  Under California law, the crime of perjury requires that

7   a witness give a statement that he or she knows is false.  Penal Code § 118(a).[6]  Petitioner does not

8   argue that Ruelas intentionally gave a false description of the boots; rather, he alleges that Ruelas

9   provided inconsistent descriptions of the boots due to manipulative conduct by the prosecutor.

10   (Petition, Exhibit B at 6.)  As stated above, discrepancies in testimony is not false or perjurious

11   simply because it differs from previous recollections.  See United States v. Zuno-Arce, 44 F.3d at

12   1423 (discrepancies in testimony "could as easily flow from errors in recollection as from lies.")

13   Petitioner had the opportunity, of which he took advantage, to cross-examine Ruelas and it is the

14   jury's determination as to whether such testimony was credible and accurate.

15         Second, even if Ruelas lied under oath, Petitioner has failed to demonstrate that the

16   prosecutor knew or should have known such testimony was false.  Petitioner incoherently argues that

17   the prosecutor "started to with out [sic] Mr. Ruelas knowledge Suborn Suggestive testimony from

18   Mr. Ruelas . . . ." (Petition, Exhibit B at 6.)  Petitioner's claim is factually baseless.  The mere fact

19   that the prosecutor elicits testimony that may contradict other testimony or differs from prior

20   testimony does not rise to the level of prosecutorial misconduct.  Zuno-Arce, 44 F.3d at 1423

21   (pointing out that lawyers in criminal cases are often forced to present conflicting testimony and

22   "must necessarily trust the jury to determine what is true, or whether reasonable doubt remains about

23   what is true").  Moreover, the jury was instructed with CALJIC 2.21.1, which stated,

24           Discrepancies in a witness's testimony or between a witness's testimony and
        that of other witnesses, if there were any, do not necessarily mean that a witness

25         should be discredited.  Failure of recollection is common.  Innocent misrecollection is
        not uncommon.  Two persons witnessing an incident or a transaction often will see or

26

27         [6] Penal Code § 118(a) defines perjury as follows: "Every person who, having taken an oath that he or she will testify
    . . . truly before any competent tribunal, . . . willfully and contrary to the oath, states as true any material matter which he or

28   she knows to be false . . . is guilty of perjury."

1    hear it differently.  Whether a discrepancy pertains to an important matter or only to
      something trivial should be considered by you.
2
     (CT 341.)
3
          Additionally, the jury was instructed pursuant to CALJIC 2.21.2, which states,
4
               A witness, who is willfully false in one material part of his or her testimony, is
5           to be distrusted in others.  You may reject the whole testimony of a witness who
            willfully has testified falsely as to a material point, unless, from all the evidence, you
6           believe the probability of truth favors the testimony in other particulars.

7    (CT 341.)  Accordingly, the jury was properly instructed as to how it was to judge conflicting

8    testimony, and the jury is presumed to have followed such instructions.  <u>Francis v. Franklin</u>, 471

9    U.S. at 324 n.9.

10         Lastly, the alleged perjured testimony did not and could not have affected the trial's outcome.

11   As submitted by Respondent, the evidence established that Petitioner's wife pawned the jewelry that

12   was stolen in the robbery just three days after it occurred.  (RT 216, 244, 246, 271, 316-319, 427-

13   428, 457-458.)  Although disputed by Petitioner, he closely matched the description of one of the

14   two intruders.  (CT 399; RT 190, 237, 434, 554.)  The jury heard the evidence that Petitioner

15   instructed his wife to perjure herself in an attempt to conceal the acquisition of the stolen jewelry, of

16   which Petitioner's consciousness of guilt could have likely been inferred.  (RT 503-506, 508.)

17   Defense counsel cross-examined Ruelas and attempted to impeach his credibility. **(***See*** RT 218-230.**)**

18   Thus, in light of the evidence in this case, it simply cannot be said that the alleged perjured testimony

19   had any affect on the trial's outcome.

20         3.    <u>Authorization of Jell-cell Search</u>

21         Petitioner contends that the prosecutor committed misconduct by authorizing the search of

22   his jail cell.  This claim was raised in Petitioner's second and third habeas petitions to the California

23   Supreme Court (Resp's Mot. to Dismiss, Exhibit H, at arg. 1c; and Exhibit I at "C") and was rejected

24   on procedural grounds (Court Doc. 20, attach no. 1).   Accordingly, review of this claim is de novo

25   because there is no state court adjudication on the merits.  <u>See</u> <u>Killian v. Poole</u>, 282 F.3d 1202, 1208

26   (9th Cir. 2002) (de novo rather than deferential review is appropriate where the state court has not

27   adjudicated a claim on the merits).

28          As Respondent correctly argues, Petitioner's claim is a re-characterization of a Fourth

1  Amendment claim barred by <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976).  To the extent the claim can

2  be construed as a claim based on prosecutorial misconduct, it fails on the merits.

3       As summarized in detail above under section D, between Petitioner's first and second

4  mistrials the prosecutor ordered a search of Petitioner's jail cell after Petitioner and his wife, Clarissa

5  Hurtado, were observed showing each other notes after they learned their jailhouse conversations

6  were being recorded.  The officers were instructed by the prosecutor to not search or seize anything

7  marked as "legal mail."  (RT 23, 25, 30-32, 65, 76.)  The prosecutor did not obtain a search warrant

8  as he believed it was unnecessary.  (RT 76.)  During the search, officers seized a writing pad which

9  contained rap lyrics on the first page however subsequent pages contained Petitioner's handwritten

10  notes apparently intended for his counsel.  (CT 221; RT 11/12/98 51-53, 56-57, 104.)

11       The prosecution's instruction to search the jail cell of Petitioner was not unlawful as an

12  inmate ordinarily has no reasonable expectation of privacy in his jail cell.  <u>Hudson v. Palmer</u>, 468

13  U.S. 517, 526 (1984).  Pretrial detainees have a similarly limited expectation of privacy in their jail

14  cells.  <u>Bell v. Wolfish</u>, 441 U.S. 520, 555-557 (1979); <u>Mitchell v. Dupnik</u>, 75 F.3d 517, 522 (9th Cir.

15  1996) (pretrial detainee no reasonable expectation of privacy in cell); <u>People v. Davis</u>, 36 Cal.4th

16  510, 524-527 (2005) (surveying state and federal law holding that <u>Hudson</u> applies to pre-trial

17  detainees as well as prisoners); <u>United States v. Van Poyck</u>, 77 F.3d 285, 290 (9th Cir. 1996) (pretrial

18  detainee did not have subjective or reasonable expectation of privacy in telephone calls from jail at

19  Metropolitan Detention Center.)  Here, the search of Petitioner's cell was ordered because it was

20  discovered that Petitioner and his wife were writing notes during visits after they discovered their

21  conversations were being recorded.  The search was specifically limited to non-privileged items

22  excluding the label "legal mail."  (RT 23, 25, 30-32, 65, 76.)  Given these circumstances, the

23  ordering of the search of Petitioner's cell did not violate the Fourth Amendment, and there could be

24  no resulting prosecutorial misconduct.

25       Moreover, in light of the factual findings made by the state court Petitioner has not, and

26  cannot, demonstrate his burden of showing that the prosecutor's order to search the jail cell so

27  infected the trial with unfairness as to make the resulting conviction a denial of due process.  The

28  presumptively correct factual findings made by the state court demonstrate that (1) the prosecutor did

1   not discuss Petitioner's notes with the investigator who seized them; (2) the investigator quickly

2   scanned the rap lyrics and notes, perusing it only to the degree necessary to determine that it might

3   fall within the perimeters of the prosecutor's instructions that he was to search for evidence of a

4   conspiracy to commit perjury; (3) because investigator Andrews had only quickly scanned the notes,

5   he could not have conveyed the contents to the prosecutor with the specificity necessary to generate a

6   tangible strategic or evidentiary benefit to the People; (4) the People did not obtain any benefit from

7   the seizure of the notes; and (5) the notes were not exploited in any way and no evidence was

8   subsequently discovered because of the presumptively illegal search and seizure.  (Resp's Mot. to

9   Dismiss, Exhibit C at 24-25.)  These factual findings of which Petitioner has failed to rebut by clear

10  and convincing evidence negate the argument by Petitioner that the ordering of the search of his jail

11  cell so infected the trial with unfairness as to make his conviction a denial of due process.  As such,

12  Petitioner's claim fails on the merits.

13          4.      Recording of Jail-house Conversations with Wife

14          Petitioner contends that the prosecutor committed misconduct by ordering the recording of

15  conversations between Petitioner and his wife when she visited him in jail.  Petitioner raised this

16  claim in his second and third state habeas petitions to the California Supreme Court (Court Doc. 15,

17  Resp's Mot. to Dismiss, Exhibit H, arg. 1d; Exhibit I at "C"), which was rejected for procedural

18  reasons (Court Doc. 20, attach no. 1.)  Accordingly, review of this claim is de novo because there is

19  no state court adjudication on the merits.  See Killian v. Poole, 282 F.3d 1202, 1208 (9th Cir. 2002)

20  (de novo rather than deferential review is appropriate where the state court has not adjudicated a

21  claim on the merits).

22          As with the previous sub-claim, this claim is a re-characterization of a Fourth Amendment

23  claim barred by Stone v. Powell, 428 U.S. 465, 494 (1976).  In any event, it fails on the merits.

24          On August 16, 1998, the day before Petitioner's first jury trial, a deputy sheriff at the county

25  jail tape recorded a conversation between Petitioner and his wife, Clarissa Hurtado.  (CT 149, 225-

26  247; RT 331-333, 491.)  The California Court of Appeal summarized the conversation as follows:

27              During this visit Petitioner instructed Hurtado to fabricate a story about how
            she had obtained the chain and crucifix.  Hurtado told Petitioner that she would testify
28          that she had purchased the chain at a flea market a few years ago.  She would describe

1    the stones in the crucifix as being orange in color and not rubies.

2    (Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C at 4-5.)  It was noted that during the conversation

3    "Hurtado held up pieces of paper to the glass separator during this conversation."  (Id. at 5; see CT

4    249 (Hurtado stated the notes "had nothing to do with my testimony").)

5         As with the previous subclaim, this claim is premised on the notion that the recording of the

6    conversation in the visiting room was unconstitutional.  To the contrary, the Constitution does not

7    prohibit the eavesdropping or recording of conversations in a prison, jail, or police station.  Lanza v.

8    New York, 370 U.S. 139, 143-144 (1962) (rejecting the notion that the visiting room of a public jail

9    is a constitutionally protected area); United States v. Van Poyck, 77 F.3d at 290-291 (holding that

10   audiotaping of pretrial detainee's telephone calls did not implicate the Fourth Amendment);

11   Donaldson v. Superior Court, 35 Cal.3d 24, 29 (1983) ("Federal courts, however, have consistently

12   followed Lanza and upheld admission of monitored conversations in jails or police stations.")

13        As Respondent correctly argues, law enforcement did not act improperly when eavesdropping

14   on the conversations between Petitioner and his wife while in the visiting room of the public jail.

15   This conversation was not privileged and there is no allegation that any privileged conversations with

16   counsel were monitored or recorded.  Accordingly, Petitioner had no reasonable expectation of

17   privacy and his constitutional rights were not violated.

18        Petitioner further argues that the prosecution improperly utilized Hurtado as its agent by

19   offering her immunity in exchange for her testimony against Petitioner.  (Petition, Exhibit B at 8

20   (citing Maine v. Moulton, 474 U.S. 159 (1985)).)  Petitioner's reliance on Moulton is misplaced.

21   There, it was held that the Sixth Amendment right to counsel is violated if the state knowingly

22   circumvents the right to counsel by a confrontation between the accused and a state agent.  Id. at 176.

23   However, the Sixth Amendment is not violated if the state obtains an incriminating statement "by

24   luck or happenstance" after the right to counsel has attached.  Id.  In Moulton, unlike here, the co-

25   defendant had an express agreement with the state and its undercover agent to elicit evidence.  Here,

26   Petitioner has not submitted any evidence to demonstrate that at the time of the tape-recorded

27   conversation, Hurtado was acting pursuant to an agreement with the state to elicit incriminating

28   statements from Petitioner.  To the contrary, Hurtado had no knowledge that the conversation was

1   being monitored and recorded.  (*See* e.g., CT 227 lines 8-9 (Hurtado asked Petitioner to keep his

2   voice down when he told her to "make up something").)  Petitioner's claim is without merit.

3          As to all of Petitioner's prosecutorial misconduct claims, he fails to demonstrate resulting

4   prejudice, and such prejudice is highly unlikely given the strong independent evidence of his guilt.

5   The crime victim, Ruelas, identified the assailant who found the money in the residence and shot him

6   in the face as an African-American male wearing black clothing and rugged black work boots.  (RT

7   179-180, 184, 189-190, 236-237.)   During a search of Petitioner's wife's residence, police found a

8   pair of black work boots, three black men's t-shirts and correspondence addressed to Petitioner.  (RT

9   248-249, 256-257.)  Petitioner's wife testified that Petitioner had a pair of boots at her residence,

10  although she was not certain if they were there at the time of the crime or when police searched the

11  residence.  (RT 488.)  However, at trial, Ruelas identified the boots seized from Hurtado's residence

12  as the same boots worn by the man who shot him in the face, and DNA evidence indicated these

13  same boots were splattered with Ruelas's blood.  (RT 217-218, 251-253, 279-281, 358-359, 363.)  In

14  addition, Petitioner's wife pawned the stolen jewelry just a few days after the incident (RT 216, 244,

15  246, 271, 316-319, 427-428, 457-458), and engaged in a tape-recorded conversation with Petitioner

16  where she was instructed by Petitioner to fabricate facts regarding her acquisition of the stolen

17  jewelry.  (RT 503-506, 508.)  In light of this evidence, it simply cannot be said that any alleged

18  misconduct on the part of the prosecutor so infected the trial with unfairness as to result in a denial

19  of due process, and Petitioner's claim fails on the merits.

20  F.      Juror Misconduct

21          Petitioner contends that Juror No. 5 engaged in misconduct by attempting to use personal

22  expertise to understand DNA evidence and explain it in simpler terms to fellow jurors.  (Petition,

23  Exhibit C at 9-11.)  This claim was presented on direct appeal by way of a challenge to the trial

24  court's inquiry regarding the alleged juror misconduct (Resp's Mot. to Dismiss, Exhibit B at 11-17),

25  resulting in prejudicial misconduct.  Id. at 18-20.  The Court of Appeal rejected the claim in a

26  reasoned opinion.  (Resp's Mot. to Dismiss, Exhibit C at 6-13.)  The claim was raised again in

27  Petitioner's second habeas petition to the California Supreme Court (Court Doc. 15, Resp's Mot. to

28  Dismiss, Exhibit H, arg. 2), and was rejected on procedural grounds.  (Court Doc. 20, attach no. 1.)

As set forth by the Court of Appeal, the factual circumstances surrounding this claim are as follows:

> Prior to the attorneys' opening statements, the jurors were given preliminary instructions. These included the standard admonitions not to independently investigate the matter, and not to discuss the case until it was submitted for decision. Juror No. 5 asked the court whether the jurors were "allowed to ask questions." The court replied that "If you have a question, just write it down. I will make sure I share it with the attorneys."
>
> During the evidentiary phase of the trial, Juror No. 5 sent three notes to the court. In the first note he asked whether any fingerprints were taken at the crime scene and about a crime scene diagram. The court passed the note on to counsel and also instructed the jurors as follows:
>
> "Just want to remind you, if you do have a question that comes up during the course of the trial about the evidence, just write it in a note, give it to the bailiff. He will give it to me. I will share it with the lawyers.
>
> "Can't guarantee you that they will ask the question, but at least I will share it with them, they can proceed. And remember that you have to base your decision on the evidence during the course of the trial, what you hear in the courtroom."
>
> The second note asked how saliva would affect a DNA sample. This note was also given to counsel.
>
> In his third and final note, Juror No. 5 asked for the DNA profiles to be converted to the probable number of persons who fit a profile that is based on the following two assumptions: (1) the United States has an approximate population of 2.6 multiplied by ten to the eighth power; (2) approximately 10 percent of the population is Hispanic. He then wrote an equation, the solution of which is that there are "10 persons in the Continental U.S. who fit this profile."
>
> After receiving this missive, the court held an unreported in-chambers discussion regarding Juror No. 5. In a settled statement prepared in connection with this appeal, the parties agreed that during the conference the court decided to admonish the juror not to consider extrinsic evidence. Although Juror No. 5 was described as a "loose cannon," neither side asked to have him removed. No discussions were held whether inquiry should be made to determine whether the rest of the jury had been exposed by Juror No. 5 to an extrinsic theory. It was also mentioned during this conference that this juror had previously approached both the trial judge and the prosecutor outside the courtroom to discuss the case and that each had refused to talk with him.
>
> Thereafter, the following colloquy with Juror No. 5 was held outside presence of the other jurors:
>
> "THE COURT: Good Morning.
>
> "Juror 5), you sent a note out that has kind of mathematical things on it. I just want to remind you that, as a juror, you have to remember you can't conduct your own investigation or do experiments. You can accept or reject the testimony that you hear, but be careful about- - pretty complicated question. Be careful about conducting your own investigation outside of the evidence that's presented to you.
>
> "I know you are an engineer.
>
> "JUROR 5: Yeah, I am. I tried to warn you.
>
> THE COURT: It's tough to do that, I know. It's tough to do that.
>
> "JUROR 5: The reason I was doing it, the way things were set up, it's hard for a person that isn't inclined to get a grasp on it. So by rearranging it, it makes it simpler. That's why I was doing it.
>
> "THE COURT: But you have to use the information that you hear in the courtroom and you can't go beyond that. I know it's hard to do that, but just keep that in mind, okay?

24

"JUROR 5: Okay.
"THE COURT: Okay.  Great. Thanks."
        Juror No. 5 rejoined the other jurors and the following discussion with counsel was held:
        "[DEFENSE COUNSEL]: Implicit in his answer was this-- at least to me was the sentence that the way the DNA evidence was presented was so complicated that he was trying to make it simple.
        "THE COURT: For the rest of the jurors.
        "[DEFENSE COUNSEL]: For the rest of the jurors.  That's what troubles me. If he is trying to interpret it for his own purposes, that's not allowed either, but if he is trying to law it out-
        "THE COURT: You can't be a teacher for the other jurors.
        "[DEFENSE COUNSEL]: I just-
        "THE COURT: But he can't do that.  We need to be careful.  See if he has any further questions.  Make sure we have a specific instruction on that.  He just said, 'I tried to warn you about being an engineer.'
        "[PROSECUTOR]: I don't remember that admonition he gave us.
        "THE COURT: I don't either.
        "[DEFENSE COUNSEL]: He certainly didn't say that he wouldn't be a good juror because he was an engineer.
        "THE COURT: So far he has been a good juror because he is taking notes and everything, interested in the trial from that standpoint.
        "On the other hand, he seems to be going a little bit far on the whole thing.
        "I don't know what he meant by, 'I warned you.'  Did he say something during jury selection?  I don't recall.
        "[DEFENSE COUNSEL]: I don't remember.
        "THE COURT: Maybe he did.  I don't recall.  We could always pull up his statements at the time.
"[Clerk], maybe you could find that."
        There was no other discussion on this topic during trial.
        Immediately before the jury began deliberating, the court reminded the jurors that they were to rely exclusively on the evidence presented at trial, as follows: "I wanted to remind you, in this case, you must not independently investigate the facts or the law or consider or discuss facts as to which there is no evidence.  This means, for example, that you must not on your own visit the scene, conduct experiments or consult reference works or persons for additional information.  Okay.  You have to rely on the evidence presented in this trial."  It also directed the jurors to advise the court immediately if any of them expressed an intention to disregard the law or decide the case on any improper basis.

(Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C at 6-9.)

        "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835 (1974).  The showing of a single jurors bias or prejudice may result in the denial of the right to an impartial jury.  See Tinsley v. Borg, 895 F.2d 520, 523 (9ᵗʰ Cir. 1990).  On collateral review, if misconduct occurred, the petitioner must show that

25

1   the alleged error "'had a substantial and injurious effect or influence in determining the jury's

2   verdict.'" Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507

3   U.S. 619, 637 (1993)); see also Hughes v. Borg, 898 F.2d 695, 699 (1990).

4          The California Court of Appeal rejected the claim finding that the trial court's inquiry into

5   the alleged misconduct was adequate and Petitioner failed to establish that misconduct occurred.[7]

6   The state court specifically held as follows:

7          In any event, even if the argument had been preserved, it lacks merit. The
       applicable standard of review is undisputed: "The decision whether to investigate the
8       possibility of juror bias, incompetence, or misconduct, as well as the ultimate decision
       whether to retain or discharge a juror, rests within the sound discretion of the trial
9       court. [Citation.] If any substantial evidence exists to support the trial court's exercise
       of its discretion pursuant to section 1089, the court's action will be upheld on appeal."
10   (People v. Bradford (1997) 15 Cal.4th 1229, 1351, 65 Cal.Rptr.2d 145, 939 P.2d 259.) A juror's
       inability to perform must appear in the record as a demonstrable reality. Misconduct will not be
11   presumed. (People v. Franklin (1976) 56 Cal.App.3d 18, 25,-26, 128 Cal.Rptr. 94.)
          The court inquiry was sufficient and abuse of discretion has not been shown.
12       It appears from the totality of the record that Juror No. 5 was sending notes because
       he perceived the People's case to be disorganized and incomplete. The juror cannot
13       be faulted for following the court's discretion to submit questions about the case to it.
       Juror No. 5 explained that he/she perceived the presentation of DNA evidence to have
14       been confusing. His/her note was intended to suggest a rearrangement of this
       evidence that, in the juror's opinion, would increase its comprehensibility. He/she did
15       not express an opinion on defendant's guilt or innocence or indicate that he/she
       harbored any bias against the accused. His/her requests for clarification of the
16       evidence do not constitute misconduct. [FN6: Furthermore, we reject defendant's
       characterization of Juror No. 5's first two notes as incomprehensible. The questions
17       asked therein were intelligent and reasonably related to the evidence.]
          There was no indication that Juror No. 5 brought outside evidence into the
18       jury room or that he/she relied on such evidence in drafting the note. [FN 7: Thus,
       cases cited by defendant in which a juror read a newspaper article about the accused
19       (People v. Halloway (1990) 50 Cal.3d 1098, 269 Cal.Rptr. 530, 790 P.2d 1327,
       disapproved of on another ground in People v. Stansbury (1995) 9 Cal.4th 824, 38
20       Cal.Rptr.2d 394, 889 P.2d 588), or independently questioned a witness (People v.
       Pierce (1979) 24 Cal.3d 199, 155 Cal.Rptr. 657, 595 P.2d 91) are inapposite.] There
21       is also no support for the proposition that he/she possessed any special expertise in the
       science of DNA profiling and relied on this proficiency in drafting the note.
22       Knowledge of the population of the United States and the percentage of Hispanics
       (the two assumptions contained in his third note) fall comfortably within the broad
23       category of general knowledge known by reasonably well-read individuals. Likewise,
       the mathematical equation contained in the note is not abnormally complex. Jurors
24       are not expected to become blank slates, expunged of all influences. As explained in

25

26          [7] As submitted by Respondent, the California Court of Appeal additionally rejected this ground as waived pursuant
       to California's contemporaneous objection rule. (Resp's Mot. to Dismiss, Exhibit C at 9-10.) That default was possibly
27   undone by the California Supreme Court's subsequent denial of the claim for other procedural grounds. See Lambright v.
       Stewart, 241 F.3d at 1205 (stating that procedural bars are not immortal . . . ; they may expire because of later actions by state
28   courts" (quoting Ylst v. Nunnemaker, 501 U.S. at 811)).

*People v. Pride* (1992) 3 Cal.4th 195, 10 Cal.Rptr.2d 636, 833 P.2d 643:

"[L]ay jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process. 'That they do so is one of the strengths of the jury system. It is also one of its weaknesses . . . . Such a weakness, however, must be tolerated.'" (3 Cal.4th at p. 268, 10 Cal.Rptr.2d 636, 833 P.2d 643.)

Likewise, there is no indication in the record that Juror No. 5 shared his/her suggested rearrangement of the DNA profile data with the other jurors either prior to or during jury deliberations. Defendant has submitted no affidavits to support his speculation that Juror No. 5 disregarded the court's instruction in this regard. Defendant's assertion that the trial judge recognized that Juror No. 5 had acted as a teacher for the other jurors is inaccurate. In fact, the judge had simply pointed out the obvious: that it would be impermissible for Juror No. 5 to do so.

The court admonished Juror No. 5 that he/she was to rely exclusively on the evidence as it was presented by the witnesses and not to rearrange or reanalyze it. Juror No. 5 unequivocally agreed to follow the court's direction by replying "Okay." Juror No. 5 did not ask any further questions during the remainder of the trial, or otherwise attempt to communicate with the attorneys or the court. The jury was instructed to report any juror who expressed an intention not to decide the case based on the evidence presented. None of the other jurors indicated to the court that Juror No. 5 was behaving improperly or that he/she was relying on extrinsic evidence.

Therefore we conclude that defendant has not demonstrated that further inquiry would have revealed a real possibility that Juror No. 5 committed misconduct either by relying on extraneous information in reaching his/her decision or by communicating extrajudicial information to other jurors. Defendant's argument to the contrary is both speculative and contrary to the legal presumption that the jurors understood and followed their instructions. (*Francis v. Franklin* (1985) 471 U.S. 307, 324-325, fn. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344; *People v. Beach* (1983) 147 Cal.App.3d 612, 629-630, 195 Cal.Rptr. 381.) Accordingly, abuse of discretion has not been shown in connection with the sufficiency of the court's inquiry or its failure to discharge this juror sua sponte.

(Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C at 10-13.)

The state court's factual findings were not objectively unreasonable in light of the evidence presented. 28 U.S.C. § 2254(d)(2). Specifically, the state court's factual finding that (1) Juror No. 5 did not demonstrate any bias against Petitioner; (2) there was no indication that Juror No. 5 utilized extrinsic evidence or took such evidence into the jury room; (3) there was no showing that the juror had special expertise in the science of DNA profiling; and (4) there was no indication that the juror shared the suggested rearrangement of the DNA profile with the other jurors, are reasonable. Petitioner has not presented clear and convincing evidence in rebuttal. 28 U.S.C. § 2254(e)(1). Accordingly, Petitioner has failed to demonstrate that any alleged misconduct had a "substantial or injurious effect" on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. at 637-638.

G.   <u>Insufficient Evidence of Attempted Murder</u>

Petitioner contends that there was insufficient evidence to support his conviction for willful, deliberate and premeditated attempted murder. This claim was presented on habeas corpus in the

27

state superior court and was denied in a reasoned decision on the merits and on procedural grounds. (Resp's Mot. to Dismiss, Exhibit E at "exhibit B.") The California Court of Appeal denied the claim without comment, presumably adopting the superior court's reasoning.  (Id. at Exhibit F.)  The claim was subsequently raised in Petitioner's first and third habeas petitions in the California Supreme Court, which was denied on procedural grounds.  (Resp's Mot. to Dismiss, Exs G & I; Court Doc. 20, attach no. 1.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n.16.  Under AEDPA, the pertinent inquiry is whether the decision of the state court reflected an unreasonable application of the standard as set forth in Jackson.  Juan H. v. Allen, 408 F.3d 1262, 1274-1275 (9th Cir. 2005), as amended.

An insufficiency of the evidence claim is reviewed under the elements as set forth by state law.  Id. at 1276.  Under California law, the crime of attempted murder requires proof of the following two elements:

> One, a direct but ineffectual act was done by one persons [sic] towards killing another human being; and, two, the person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.

(RT 567; see CT 353; CALJIC No. 8.66.)

With regard to the degree of murder, the jury was instructed as follows:

> If you find the defendant guilty of attempted murder, you must determine whether this allegation is true or not true.  "Willful" means intentional.  "Deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. "Premeditated" means considered beforehand.
> If you find that the attempted murder was preceded and accompanied by clear, deliberate intent on the part of the defendant to kill which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under the sudden heat of passion or other condition precluding the idea of premeditation, it is the attempt to commit, willful, deliberate and premeditated murder.

28

1   (RT 567-568; *see* CT 355; CALJIC No. 8.67.)

2        Petitioner contends that there was no physical evidence connecting him to the attempted

3   murder and the evidence raised "at most a suspicion of petitioners guilt." (Petition, Exhibit D at 13,

4   15.) Ample evidence supported Petitioner's conviction and his claim is without merit. The jewelry

5   stolen from the victims was linked to Petitioner's wife. (RT 216, 244-246, 256, 271, 316-320, 427-

6   428, 457-458.) At Petitioner's request, his wife lied about the acquisition of the jewelry. (RT 503-

7   506, 508; CT 225-247.) A pair of work boots matching the description as those worn by the

8   perpetrator were found at Petitioner's wife's residence and contained DNA evidence consistent with

9   the victim's genetic profile. (RT 217-218, 251-253, 279-281, 358-359, 363.) The victim testified

10  that the African-American shooter repeatedly threatened to shoot and kill him (RT 180, 187) and

11  ultimately shot him after giving him a "weird look." (RT 189.) This evidence viewed in the light

12  most favorable to the prosecution, supports the jury's finding of willful, deliberate and premeditated

13  attempted murder, and the state courts' determination of this issue was not contrary to, or an

14  unreasonable application of, clearly established Supreme Court precedent.

15  H.    Ineffective Assistance of Counsel

16       Petitioner contends that his trial attorney was ineffective for failing to object to the

17  prosecutor's reference to Petitioner's admission that he owned the boots linked to the crime during

18  opening statement. Petitioner contends that counsel should have sought to exclude this evidence

19  prior to trial, rather than in the middle of it. This claim was presented on direct appeal. (Resp's Mot.

20  to Dismiss, Exhibit B at 37-39.) The California Court of Appeal rejected the claim on the merits in a

21  reasoned decision. (Id., Exhibit C at 20.) Petitioner subsequently raised this claim in his second and

22  third state habeas petitions filed in the California Supreme Court (Id., Exhibits H & I.), which were

23  denied on procedural grounds. (Court Doc. 20, attach no. 1.)

24        The law governing ineffective assistance of counsel claims is clearly established for the

25  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151

26  F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance

27  of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104

28  S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must

1   show that counsel's performance was deficient, requiring a showing that counsel made errors so

2   serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

3   Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

4   objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were

5   not the result of reasonable professional judgment considering the circumstances. Id. at 688; United

6   States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

7   performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

8   within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104

9   S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

10   Second, the petitioner must show that counsel's errors were so egregious as to deprive

11   defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

12   also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

13   ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

14   1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was

15   unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is

16   a reasonable probability that, but for counsel's unprofessional errors, the result would have been

17   different.

18   A court need not determine whether counsel's performance was deficient before examining

19   the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

20   668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that

21   does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are

22   analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).

23   Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

24   In rejecting Petitioner's claim, the Court of Appeal stated as follows:

25   Furthermore, ineffective assistance of counsel has not been established.  "[A] mere failure to object to evidence or argument seldom establishes counsel's

26   incompetence" (People v. Ghent (1987) 43 Cal.3d 739, 772, 239 Cal.Rptr. 82, 739 P.2d 1250).  This is inherently a matter of trial tactics that is not ordinarily reviewable on direct appeal.  (People v. Padilla (1995) 11 Cal.4th 891, 940, 47 Cal.Rptr.2d 426,

27   906 P.2d 388, overruled on another ground in People v. Hill, supra, 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673.)  Counsel's failure to object during the

28

30

1    prosecutor's opening statement may have been a deliberate tactical decision because

2    such action necessarily would have called additional attention to the prosecutor's
     opening statement.

3    (Court Doc. 15, Resp's Mot. to Dismiss, Exhibit C, at 20.)

4         The Court of Appeal applied the proper standard for evaluating an ineffective of assistance of

5    counsel claim by citing and analyzing People v. Padilla, which applied the standard as set forth in

6    Strickland v. Washington, 466 U.S. 668, and the state courts' determination of this issue was not

7    contrary to, or an unreasonable application of, Strickland.                    .

8         Specifically, Petitioner takes issue with the state court's reasoning that counsel made a

9    tactical decision not to object and draw attention to the statement.  Petitioner points to the fact that

10   during trial counsel stated that he did not recall the issue being mentioned earlier and he "wouldn't

11   let it pass without making an objection, either this time or the last time."  (RT 310.)  The record

12   demonstrates only that counsel did not recall the prosecutor's reference to Petitioner's admission

13   during opening statement.  (Id.)  Thus, the statement by counsel that he would have objected to such

14   statement was after-the-fact speculation.

15        However, even if counsel was ineffective by failing to object, Petitioner has not shown that

16   he suffered any prejudice as a result.  As previously discussed under section E.1., the jury was

17   specifically instructed that the prosecutor's opening statement was not evidence (RT [4/19/99 159,

18   165]), and the jury is presumed to have followed that instruction.  Francis v. Franklin, 471 U.S. at

19   324 n.9.  Under the circumstances of this case, where the prosecutor made only a brief reference to

20   the statement during opening statement, of which the jury was instructed was not evidence,

21   Petitioner has not, and likely cannot, demonstrate prejudice under Strickland.  See Kimmelman v.

22   Morrison, 477 U.S. 365, 382 (1986) (Strickland standard is "highly demanding.")

23                                  RECOMMENDATION

24        Based on the foregoing, it is HEREBY RECOMMENDED that:

25        1.    The instant petition for writ of habeas corpus be DENIED; and

26        2.    The Clerk of Court be directed to enter judgment in favor of Respondent.

27        This Findings and Recommendations is submitted to the assigned United States District

28   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    September 14, 2007                      /s/ Sandra M. Snyder**
UNITED STATES MAGISTRATE JUDGE